UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|                                            |   |                        |
|--------------------------------------------|---|------------------------|
| SECURITIES AND EXCHANGE COMMISSION,        | ) |                        |
|                                            | ) |                        |
| Applicant,                                 | ) | Miscellaneous Business |
|                                            | ) | Docket No.             |
| v.                                         | ) |                        |
|                                            | ) |                        |
| CARLOS R. GARZA,                           | ) |                        |
|                                            | ) |                        |
| Respondent.                                | ) |                        |

**MEMORANDUM IN SUPPORT OF APPLICATION FOR ORDER
TO SHOW CAUSE AND FOR
<u>ORDER TO COMPLY WITH ADMINISTRATIVE SUPBOENA</u>**

Respondent Carlos R. Garza ("Respondent" or "Garza") failed to comply with an administrative subpoena seeking testimony and documents issued by the staff of the Securities and Exchange Commission (the "Commission") in connection with the Commission's formal investigation, *In the Matter of GAW Miners, LLC*, File No. B-2979.

The Commission subpoenaed Respondent to testify on Wednesday, August 12, 2015. When he appeared for testimony, Garza had two options: (1) testify, or (2) invoke a valid privilege not to do so. He did neither. Garza refused to provide any substantive testimony and further refused to assert any valid privilege. He claimed that because he did not understand the securities laws, he felt scared and intimidated and therefore would not answer any questions. The Commission therefore requests that this Court issue: (1) an Order to Show Cause why Respondent should not comply with the administrative subpoena; and (2) an Order compelling Respondent to appear for testimony in the Commission's Boston Regional Office and further to provide testimony or assert a specific, valid legal right or privilege not to do so.

## BACKGROUND

**1. The Commission Issued a Formal Order of Investigation Authorizing Its Staff to Issue the Administrative Subpoena.**

The Commission is statutorily authorized to issue subpoenas to compel testimony and the production of documents in its investigations. *See* Section 19(c) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §77s(c)] and Section 21(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §78u(b)] (in conducting investigations, "the Commission or any officer designated by it is empowered to administer oaths and affirmations, subpoena witnesses, compel their attendance, take evidence, and require the production of any books, papers, correspondence, memoranda, or other records which the Commission deems relevant or material to the inquiry"). On February 3, 2015, the Commission issued an Order Directing Private Investigation and Designating Officers to Take Testimony ("Formal Order") in an investigation entitled *In the Matter of GAW Miners, LLC,* File No. B-02979. *See* Declaration of Gretchen Lundgren dated August 14, 2015 ("Lundgren Dec.") ¶ 3, filed herewith. Among other things, the Formal Order directed that an investigation be undertaken to determine whether certain persons or entities had violated Sections 5(a), 5(c), or 17(a) of the Securities Act, or Sections 15(a), 15(c), or 10(b) of the Exchange Act and Rule 10b-5 thereunder in connection with GAW Miners' apparent offer or sale of securities. *Id.* Specifically, the Commission is investigating whether GAW Miners, LLC, and certain affiliated individuals and entities may have engaged in fraud by selling securities that purported to entitle their holders to a share of profits from GAW's alleged virtual currency mining operations. *Id.* ¶¶ 4-5. In addition, GAW Miners' sale of these apparent unregistered securities, acting through individuals functioning as unregistered brokers, may have violated the provisions of the securities laws that require securities to be registered with the Commission, and require brokers to register with the Commission. *Id.* ¶ 4.

**2.     The Commission's Investigation Into GAW Miners**

The Commission's Division of Enforcement is investigating possible fraud in connection with GAW Miners' sale of securities, as well as potential violations of the securities registration requirements and the broker registration requirements. GAW Miners purported to be a leader in the virtual currency "mining" industry. *Id.* ¶ 5. "Virtual currency" is a digital representation of value that can be traded and functions as a medium of exchange; a unit of account; and/or a store of value, but does not have legal tender status. *See* Financial Action Task Force, "Virtual Currencies: Key Definitions and Potential AML/CFT Risks," at 4 (June 2014) (http://www.fatf-gafi.org/topics/methodsandtrends/documents/virtual-currency-definitions-aml-cft-risk.html). The most widely adopted virtual currency is bitcoin, although there are many other virtual currencies used today. Virtual currency is distinct from fiat currency, which is the coin and paper money of a country that is designated as its legal tender; circulates; and is customarily used and accepted as a medium of exchange in the issuing country. *See id.* An example of fiat currency is the United States dollar. Virtual currencies may be traded on online exchanges for conventional currencies, including the U.S. dollar, or used to purchase goods and services. *See SEC v. Shavers,* No. 4:13-cv-416, 2014 WL 4652121, *1 (E.D. Tex. Sept. 18, 2014) (explaining bitcoin in context of bitcoin market arbitrage operation).

In addition to functioning as a monetary alternative, bitcoin, and some other virtual currencies, can be "mined." "Mining" for bitcoin means applying computer power to try to solve complex equations that verify groups of bitcoin transactions." *See* Virtual Currencies*, supra* at 5, 7. The first computer (or collection of computers) to solve such an equation is awarded newly created bitcoins (or fractions thereof). This process is known as "mining," and the computer equipment used in this process, and the humans who own them, are known as "miners." *See id.*

*at 7.* Thus bitcoin mining is inherently a profit-seeking endeavor. A bitcoin miner's hope is that he can combine his computing power with others to receive a payout in the form of new bitcoins that is worth more than the expenses he incurs to purchase the specialized computer hardware that solves the relevant equations and to keep that computer equipment operational.

While GAW Miners started as a distributor of the computer hardware used in virtual currency mining, its business model transitioned, by the summer of 2014, to selling shares in the profits it claimed would be derived from its own virtual currency mining operations. GAW Miners named these shares "Hashlets" because they were claimed to represent a share of the company's purported "hashing power," (or computing power), that would be devoted to virtual currency mining. Lundgren Dec., ¶ 5. GAW Miners earned over $10 million in revenue from selling Hashlets to thousands of investors. *Id.* By late 2014, after the profitability of Hashlets began to wane, GAW Miners sponsored the introduction of its own, new virtual currency, known first as HashCoin, and eventually as PayCoin. *Id.* ¶ 6. Though GAW Miners represented to the public that PayCoin would have a fixed value of at least $20 (U.S. dollars) per PayCoin, in actuality, its value quickly declined and it is now trading at approximately $.04 per PayCoin. *Id.*

This investigation centers around the potential securities law violations that occurred in connection with GAW Miners' sale of Hashlets, and its activities surrounding potential sales of investments related to PayCoin. *Id.* ¶ 7. In particular, the Commission is investigating whether GAW Miners' claims to investors about their virtual currency mining operations were false and misleading. *Id.* GAW Miners and its Chief Executive Officer ("CEO") represented that all of the Hashlets of computing power that investors purchased would be pooled together to engage in virtual currency mining, and that investors' returns, or "payouts," would be calculated based on the success of those collective virtual currency mining operations. *Id.* According to GAW

Miners, buying a Hashlet allowed investors to mine virtual currency without the expense and expertise that would be required to purchase and maintain their own virtual currency mining equipment. *Id.* ¶ 7.

The Commission is investigating the possibility that GAW Miners and its CEO sold to investors far more Hashlets worth of computing power than the company actually had in its computing centers. *Id.* ¶ 8. The Commission is also investigating whether numerous material representations that GAW Miners and its CEO made to Hashlet purchases were true, including representations about the profitability and longevity of Hashlets, Hashlets' mining activities, and how the payouts for Hashlets were derived. *Id.* The Commission is also investigating whether GAW Miners' Hashlet sales had the hallmarks of a Ponzi scheme. *Id.* ¶ 9. In particular, the Commission is investigating whether GAW Miners may have sold far more computing power than it owned and dedicated to virtual currency mining, and therefore, whether the company may have owed investors a return that was larger than any actual return it was making on its mining operations. *Id.* If GAW Miners did not have actual mining operations, that allowed it to earn the daily mining payout that it owed to Hashlet investors, then the payouts that investors received could only have been a gradual repayment over time, as "returns," the money that they and others had invested. As a result, some investors' funds may have been used to make payments to other investors. *Id.*

With respect to PayCoin, the Commission is investigating whether individuals and entities were induced to pay significant sums of money to GAW Miners in exchange for future rights to acquire interests in PayCoin, or methods of earning money dependent on PayCoin, whether the representations made in connection with these PayCoin rights were false or misleading, and whether these rights constitute securities that are subject to the federal securities

laws. *Id.* ¶ 10.

Another component of the Commission's investigation concerns what happened to the revenue that GAW Miners earned in bitcoin and other virtual currencies, with an equivalent value of millions of United States dollars. *Id.* ¶ 11.

Respondent Garza is the brother of GAW Miners' CEO and he began working for the company in approximately August 2014, shortly before GAW Miners began selling Hashlets to the public. *Id.* ¶ 12. Though Garza had several roles at GAW Miners, he was primarily a salesman, and had responsibility for sales made through GAW Miners' resellers, and sales to "VIP" customers who had a high net worth or who made high dollar value purchases from GAW Miners. *Id.* In those roles, Garza was intimately familiar with representations that GAW Miners made to its customers about both Hashlets, and later PayCoins. *Id.* He also communicated with GAW Miners' CEO and others at the company about whether, and on what terms, GAW Miners could sell Hashlets, and later, rights dependent on PayCoins, to its investors. *Id.* ¶ 13. In connection with his sales efforts, Garza also frequently communicated with customers about the ways in which they could pay GAW Miners with bitcoins. *Id.* He thus likely has knowledge about how GAW Miners received and transferred bitcoin and other virtual currencies, as well as GAW Miners' recordkeeping relating to those bitcoin transfers.

The staff has questions for Garza concerning, among other things, his relationship and communications with customers and resellers of Hashlets, his knowledge of marketing and sales of Hashlets, his communications with GAW Miners' CEO concerning sales of Hashlets, his relationship and communications with purchasers of PayCoin, and GAW Miners' receipt and transfer of bitcoin and other virtual currencies to and from its customers and among its accounts.

### 3. Garza's refusal to provide substantive testimony.

On June 30, 2015, the Commission subpoenaed Respondent Garza to testify before officers of the Commission. His testimony was scheduled for July 28, 2015. *See* Lundgren Dec., ¶14, Ex. A. After serving the subpoena, and sending a follow up letter to Garza asking him to contact the Commission's staff, the Commission's counsel received a telephone call from Garza on July 20, 2015. During that telephone call, Garza stated that he was calling on a phone that his brother, GAW Miners' former CEO, had provided to him and that he did not feel comfortable talking on that phone. *See* Declaration of Kathleen Shields ("Shields Dec."), ¶ 3. He asked if he and the Commission's counsel could engage in a video chat or Skype call. The Commission's counsel responded that that was not possible and provided her email address so that Garza could contact her if he did not want to speak on his brother's phone. *Id.* ¶ 5. Later that day, Garza emailed the Commission's counsel and requested an extension of his testimony date so that he could retain legal counsel. *Id*. ¶ 6, Ex. A. The Commission's counsel agreed and gave him an additional week to retain counsel, until August 4. *Id*. The Commission also inquired about Garza's production of documents responsive to the subpoena, which had been due on July 14, 2015. *Id*. ¶ 7. Garza responded by email, thanking the Commission for the extension and representing that the only responsive document he had was his 1099 tax form. *Id*. ¶ 8 The Commission asked that he bring that document with him when he testified on August 4. *Id*. ¶ 9. He agreed to do so, but did not bring the document with him.

Several days later, on July 31, 2015, Mr. Garza asked for another extension of his testimony date. *Id.*, ¶ 10. While he claimed that he had "applied for many state assistance programs to reduce my cost I have yet to acquire an attorney." *Id*. The Commission's counsel agreed to give him one final extension, until August 12, 2015, to retain counsel. *Id.* ¶ 11. Mr.

7

Garza expressed satisfaction with that extension. *Id*. ¶ 12.

Garza appeared at the Commission's office on August 12, 2015 without counsel. Before the opening of the record, the Commission's counsel provided Garza with a copy of the Commission's Formal Order of Investigation, and another copy of the Commission's Form 1662, which had also been attached to the subpoena served on him. The Form 1662 explains how the Commission may use the information that witnesses provide during its investigations. *See* Lundgren Dec., ¶ 14, Ex. A. The Commission's counsel gave Garza the opportunity to ask any questions he wished to ask about those documents. Though he stated that he did not understand them, he declined to ask any questions about them, or any of their provisions.

Once the testimony began, and after Garza took an oath to tell the truth, he basically refused to provide any further substantive testimony. *Id*. ¶ 16, Ex. B. Garza refused to answer even background questions, including his full name, whether he was related to GAW Miners' CEO, his age, or his educational level. *Id.* at 14, 21, 30, 32-33. He also refused answer any questions relating to his employment at GAW Miners. *Id.* at 8, 15. Garza's refusal to answer questions extended even to basic questions about the events that had transpired during the testimony itself (whether any substantive discussion happened off the record, whether he saw documents that were placed before him). *Id.* at 18-19, 22-25.

As purported justification for his refusal to answer questions, Garza claimed that he was scared and intimidated because he did not understand what the Commission did, or the federal securities laws. *Id.* He claimed that he did not understand why he was being asked to testify. In response to the Commission's counsel's attempts to clarify that the Commission was interested in asking him questions about his work at GAW Miners, Garza refused to elaborate on why he was scared, or what specifically he did not understand. *Id.* at 7-8, 10-11, 20. Garza steadfastly

refused to provide any substantive responses to questions in what appeared to be coached obfuscation. In response to a number of basic questions about whether he saw information that was contained in a document that was placed before him, he asked "will I get in trouble if I answer that question?" *Id.* at 46-47, 48, 50, 51. Attempts by the Commission's counsel to determine what type of "trouble" he meant resulted in no further clarity. *Id.*

Garza's responses to the Commission counsel's questions were articulate. He had no trouble conversing in English. Documents received during the course of the Commission's investigation demonstrate that Garza is capable of communicating in written English. *See* Lundgren Dec., ¶ 17. Though he claimed to be uneducated in matters relating to the securities laws, he neither claimed nor demonstrated that he was lacking in ordinary intelligence such that his capacity to testify could be questioned. *Id.* ¶ 16, Ex. B at 60-61.

The Commission's counsel also asked Garza repeatedly if he wished to invoke his Fifth Amendment right against self-incrimination, and indicated that if he did so, she could not compel him to answer her questions. *Id.* at 6-7, 12, 28, 33, 34, 54, 62. Garza refused to do so. *Id.*

Garza repeatedly requested that the Commission appoint counsel for him because he claimed to be unable to afford his own attorney. Despite having requested two extensions in order to obtain counsel, and despite his email representation that he had attempted to find state assistance with retaining counsel, Garza refused to identify any steps that he had taken to attempt to locate or retain his own counsel, and refused to indicate whether there was any likelihood that he would have the resources to be able to retain his own counsel within the next two or three weeks such that a further extension had the chance to produce a meaningfully different result. *Id.* at 10, 12-13. The Commission's counsel made it clear on the record that the Commission does not appoint counsel for witnesses in its investigative proceedings. *Id.*

At that point, after nearly 90 minutes of the staff trying to understand and address Garza's concerns and his ability to obtain counsel, the parties were at an impasse concerning whether Garza's refusal to answer questions was valid. Commission counsel then suspended testimony for the purpose of seeking judicial assistance. *Id.* at 62-64.

## ARGUMENT

The Commission has served Respondent Garza with an enforceable subpoena. The Commission is conducting this investigation for the proper purpose of investigating potential violations of Sections 5(a) or (c), and 17(a) of the Securities Act, and Sections 15(a), 15(c), or 10(b) of the Exchange Act and Rule 10b-5 thereunder in connection with GAW Miners' offer or sale of securities. The Commission issued the subpoena to Garza in accordance with required administrative procedures. Garza's testimony is clearly relevant to this securities law enforcement investigation. Thus, the Court should enforce this subpoena.

Garza's refusal to provide testimony based on his unspecified apprehension about the Commission's investigation is not a valid response to a legitimate Commission subpoena. Garza's choices in response to the Commission's questions were (1) to provide truthful and complete testimony or (2) to assert a valid privilege, such as the Self-Incrimination Clause of the Constitution's Fifth Amendment. He did neither. Witnesses like Garza cannot be allowed to subvert legitimate Commission investigations by simply refusing to testify as a result of their own personal fears or their claimed lack of education.

Garza's request that the Commission appoint counsel for him is similarly a nonstarter. Garza has no right to have appointed counsel in an administrative investigation. The Commission has no funds to provide such counsel. While many witnesses retain counsel to represent them in investigative testimony, many witnesses appear without counsel. This Court

should enter an order compelling Garza either to testify, at which time he must answer the Commission's questions or assert some valid legal privilege such as his Fifth Amendment right against self-incrimination.

## I. THE COURT SHOULD ENFORCE THE COMMISSION'S SUBPOENA.

To enforce an administrative subpoena, a court must be satisfied that: (1) the inquiry is being conducted for a proper purpose; (2) the subpoena was issued in accordance with the required administrative procedures; and (3) the information sought is relevant to that legitimate purpose. *See, e.g., United States v. Powell*, 379 U.S. 48, 57-58 (1964) (enforcing administrative subpoena); *see also SEC v. Howatt*, 525 F.2d 226, 229 (1st Cir. 1975) (applying the *Powell* standard and enforcing SEC administrative subpoena in District of Massachusetts).

Once the Commission meets these criteria, a Respondent bears the burden of establishing that the Commission's purpose was unlawful or its subpoena unreasonable. *SEC v. Arthur Young & Co.*, 584 F.2d 1018, 1024 (D.C. Cir. 1978) (enforcing SEC subpoena where respondent did not demonstrate that subpoena was an unreasonable burden); *Howatt*, 525 F.2d at 229 (enforcing SEC subpoena where respondent did not demonstrate that agency was acting in bad faith); *SEC v. Murray Dir. Affiliates, Inc.*, 426 F. Supp. 684, 686 (S.D.N.Y. 1976) (enforcing SEC subpoena where "it would not be abusive for this court to compel compliance").

The First Circuit has recognized that Congress committed securities investigations to the Commission and "it is not the court's role to intrude into the [Commission's] function." *Howatt*, 525 F.2d at 229. As a result, a Respondent's burden of showing unreasonableness "is not easily met." *SEC v. Brigadoon Scotch Dist. Co.*, 480 F.2d 1047, 1056 (2d Cir. 1973) (refusing respondent's request that the court determine whether subject of inquiry was within SEC's jurisdiction; enforcing SEC subpoena where the inquiry was for a legitimate purpose and the

information sought was relevant to that inquiry).  Here, the Commission's subpoena satisfies all applicable standards, and Garza cannot meet his burden of demonstrating that the Commission's actions are unreasonable or unlawful.

### A. The Commission Has a Proper Purpose for Its Investigation.

Section 20(a) of the Securities Act and 21(a) of the Exchange Act authorize the Commission to conduct investigations into possible violations of the federal securities laws. Section 19(c) of the Securities Act and Section 21(b) of the Exchange Act further permit the Commission to subpoena witnesses and compel their attendance at testimony.  Its investigation of GAW Miners and related persons and entities is being conducted pursuant to the Formal Order issued by the Commission pursuant to those statutory provisions.  Accordingly, this investigation is lawful and falls within the scope of authority that Congress has granted to the Commission.  *See SEC v. Dresser Indus., Inc.*, 628 F.2d 1368, 1376 (D.C. Cir. 1980) (recognizing the scope of Commission's authority under §21(a) of the Exchange Act).

### B. The Subpoena Satisfies All Administrative Requirements.

The subpoena issued to the Respondent satisfies all applicable administrative requirements.  Pursuant to Section 21(b) of the Exchange Act, officers designated by the Commission are empowered to subpoena witnesses and require the production of relevant evidence.  Gretchen Lundgren, who is an enforcement attorney in the Commission's Boston Regional Office, issued the subpoena to Garza and was specifically empowered by the Formal Order with authority to subpoena witnesses and documents in connection with this investigation. Lundgren Dec., ¶ 14.  Kathleen Shields, who is a trial counsel in the Commission's Boston Regional Office, and who asked the majority of the questions during Garza's appearance on August 12, 2015, was also specifically authorized to administer oaths and compel witnesses'

testimony for the GAW Miners investigation. *Id.*

### C. The Commission Seeks Relevant Information from Garza.

For purposes of subpoena enforcement, relevance is established when the information sought is not "plainly incompetent or irrelevant for any lawful purpose." *Arthur Young & Co.*, 584 F.2d at 1029 (citing *Endicott Johnson Corp. v. Perkins*, 317 U.S. 501, 509 (1943)). The court in *Arthur Young* held that "the test is relevance to the specific purpose, and the purpose is determined by the investigators." 584 F.2d at 1031.

Here, the information sought by the Commission is directly relevant to the Commission's ongoing investigation of potential securities laws violations. Garza worked for the company that engaged in the conduct the Commission is investigating, at the time when the company was selling the apparent investment products that are the focus of that investigation. Garza's sales role at the company also put him in direct contact with customers, in situations where he served as a conduit of information between the company and its customers, and particularly some of its largest customers. His testimony about communications he had with customers is thus relevant to whether false or misleading statements were made to those customers. Documents obtained by the Commission also suggest that Garza may have had knowledge, or access to information suggesting that GAW Miners engaged in a fraudulent scheme to oversell Hashlets when compared to the computing power it possessed and used for virtual currency mining. Obtaining testimony from Garza about these documents will assist the Commission in evaluating the scienter of those potentially involved in fraud. Further, Garza appears to have information that may assist the Commission in determining how and into what accounts GAW Miners received virtual currency from its customers, which may assist the Commission in tracking that virtual currency to the present. Thus, Garza's subpoenaed testimony is directly relevant to the

Commission's investigation of possible violations of Sections 5(a) or (c), and 17(a) of the Securities Act, and Sections 15(a), 15(c), or 10(b) of the Exchange Act and Rule 10b-5 thereunder.

## II. GARZA'S REQUEST FOR APPOINTED COUNSEL IS NOT A VALID BASIS FOR HIS REFUSAL TO TESTIFY.

Garza's only asserted basis for refusing to provide testimony was his claim that the Commission should appoint counsel for him, and he would then feel comfortable testifying. His position is contrary to law, and should not be countenanced as a legitimate basis for refusing to testify. Garza simply has no right to appointed counsel in a Commission investigation. *See Lassiter v. Dep't of Soc. Servs. Of Durham Cty, N.C.,* 452 U.S. 18, 26-26 (1981) (right to appointed counsel only exists "where the litigant may lose his physical liberty if he loses the litigation"); *DesRosiers v. Moran*, 949 F.2d 15, 23 (1st Cir. 1991) ("There is no absolute right to a free lawyer in a civil case."); *Lucien v. Spencer*, 534 F. Supp. 2d 207, 209 (D. Mass. 2008) (finding no right to counsel for prisoner bringing habeas petition); *SEC v. Current Financial Services*, 62 F. Supp. 2d 66, 67 (D.D.C. 1999) (defendants have no constitutional right to counsel in SEC enforcement proceeding). Although courts have the discretion to appoint counsel in "exceptional" cases, this is not the type of case where the absence of counsel would lead to a "fundamental unfairness" that impinges on due process rights. *Cookish v. Cunningham*, 787 F.2d 1, 2 (1st Cir. 1986). To the contrary, this is a relatively straightforward securities fraud investigation, where the facts about which Garza will be asked relate to his own actions and inactions. *See* Lundgren Dec., Ex. B at 9, 11. He is not being asked for his opinions about matters of securities law, or about anything for that matter. There is no basis to believe that Garza would be incapable of understanding any questions that Commission's counsel asked him, or incapable of answering those questions truthfully.

After giving Garza about one month to retain counsel before his originally scheduled testimony date, the Commission agreed to delay his testimony for two additional weeks to allow him time to retain counsel. In that intervening six week period, there is no reason to think that Garza did anything to obtain counsel. When asked under oath, he refused to provide any description of his attempt to locate or retain counsel. Similarly, under oath, he provided no information to support a finding that a further reasonable delay would result in him obtaining the money that it would cost him to retain counsel. Any further delay is unwarranted in this on-going investigation, in which there are potentially vast investor losses. Because Garza refused to testify substantively, the Commission staff is presently unable to obtain testimony that will potentially provide important information to aid the Commission's investigation.

There is no legal precedent for permitting a witness to flaunt a Commission subpoena simply because the witness claims he cannot afford to hire counsel. Such a ruling would be extremely prejudicial to the Commission's mandate to enforce the securities laws because it would stymie the Commission's investigative authority, and potentially permit wrongdoers to escape justice simply because they may already have spent the proceeds of their fraud by the time they are subpoenaed, and have nothing left to fund the expenses of counsel.

In recognition of the need for expeditious action, Commission subpoena enforcement proceedings are generally summary in nature. *See, e.g., SEC v. Sprecher*, 594 F.2d 317, 319-320 (2d Cir. 1979); *SEC v. First Sec. Bank of Utah, N.A.*, 447 F.2d 166, 168 (10th Cir. 1971). As the Second Circuit stated in *United States v. Davey*, "[W]e take this occasion to stress again the desirability of expediting resolution of any question concerning the validity of subpoenas and the production of evidence in the district court as well as on the appellate level. These matters should be given precedence over other business." 426 F.2d 842, 845 (2d Cir. 1970) (discussing

IRS summons). Accordingly, the Commission respectfully requests that the Court act promptly to grant this Application and the requested relief.

## CONCLUSION

For the reasons stated above, the Commission requests that its Application be granted in all respects and that this Court enter: (1) an Order to Show Cause why Respondent should not comply with the administrative subpoena; and (2) an Order compelling Respondent to appear for testimony in the Commission's Boston Regional Office and further to provide testimony or assert a specific, valid legal privilege not to do so.

Respectfully submitted,

//s//Kathleen B. Shields
Kathleen Burdette Shields (BBO# 637438)
Gretchen Lundgren (BBO#644742)
U.S. SECURITIES AND EXCHANGE COMMISSION
33 Arch Street
Boston, Massachusetts 02110-1424
Phone: (617) 573-8904 (Shields)
(617) 573-4578 (Lundgren)
Shieldska@sec.gov, Lundgreng@sec.gov

Counsel for Applicant
Securities and Exchange Commission

Dated: August 14, 2015

Certificate of Service

I, Kathleen Burdette Shields, hereby certify that on August 14, 2015, I caused a true copy of the foregoing document to be served via overnight mail upon the following persons:

Carlos R. Garza
136 Hillcrest Terrace
Brattleboro, VT 05301

//s//Kathleen B. Shields
Kathleen Burdette Shields