# Exhibit B

# B-02979

# *GARZA_CARLOS_20150812*

### *8/12/2015*

**Condensed Transcript**

**Prepared by:**

SEC

Friday, August 14, 2015

Page 1

1 THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION

2

3 In the Matter of:      )

4                    ) File No. B-02979-A

5 GAW MINERS, LLC        )

6

7 WITNESS:  Carlos Garza

8 PAGES:    1 through 66

9 PLACE:    Securities and Exchange Commission

10         Boston District Office

11         33 Arch Street

12         Suite 2300

13         Boston, Massachusetts

14 DATE:    Wednesday, August 12, 2015

15

16     The above-entitled matter came on for hearing,

17 pursuant to notice, at 9:38 a.m.

18

19

20

21

22

23

24       Diversified Reporting Services, Inc.

25            (202) 467-9200

---

Page 2

1 APPEARANCES:

2

3 On behalf of the Securities and Exchange Commission:

4     KATHLEEN SHIELDS, Trial Attorney

5     GRETCHEN LUNDGREN, Counsel, Enforcement Division

6     Securities and Exchange Commission

7     Division of Enforcement

8     33 Arch Street

9     Suite 2300

10     Boston, MA 02108

11     (617) 573-8900

12

13 On behalf of the Witness:

14     CARLOS GARZA, PRO SE

15

16

17

18

19

20

21

22

23

24

25

---

Page 3

CONTENTS

1

2

3 WITNESS:                      EXAMINATION

4 Carlos Garza                       4

5

6 EXHIBITS:    DESCRIPTION            IDENTIFIED:

7 No. 95       Subpoena                22

8 No. 96       Emails                  42

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

---

Page 4

PROCEEDINGS

1

2     MS. SHIELDS:  We're on the record at 9:38 a.m.

3 on August 12, 2015.

4     BY MS. SHIELDS:

5     Q    Would you raise your right-hand please?

6     A    Yes, ma'am.

7     Q    Do you swear to tell the truth, the whole

8 truth, and nothing but the truth?

9     A    Yes, ma'am.

10 Whereupon,

11          CARLOS GARZA

12 was called as a witness and, having been first duly

13 sworn, was examined and testified as follows:

14          EXAMINATION

15     BY MS. SHIELDS:

16     Q    Would you please identify yourself for the

17 record.

18     A    My name is Carlos Garza.

19     Q    You can put your hand down now.

20         And where do you live, sir?

21     A    I live at 136 Hillcrest Terrance in

22 Brattleboro, Vermont.

23         MS. SHIELDS:  I'm Kathy Shields and this is

24 Gretchen Lundgren, and together for this proceeding we're

25 officers of the Commission.

Page 5

1 What that means is that the Commission has
2 authorized us to take testimony in these proceedings and
3 to request that people come in and provide documents to
4 us, as well as oral testimony.
5 A Yes, ma'am.
6 BY MS. SHIELDS:
7 Q Before the record opened we showed you copies
8 of two documents in this case. One is our Nonpublic
9 Order of Investigation, and that is this document here,
10 and the other is Exhibit 1 in this matter, which is the
11 SEC's Form 1662. Do you have any questions that you'd
12 like to ask us on the record?
13 A I don't. I don't understand them, but I have
14 seen them.
15 Q Just to give you a little bit of background
16 here, this is an investigation by the United States
17 Securities and Exchange Commission in the matter of GAW
18 Minors LLC, it is our file No. B-2979, and our
19 investigation is to determine whether there have been any
20 violations of the federal securities laws, or any other
21 provisions of the laws that the SEC enforces.
22 However, facts that we develop in this investigation
23 might constitute violations of other federal, state,
24 civil or criminal laws.
25 Understanding that you have not consulted with

Page 6

1 an attorney, are you nonetheless prepared to answer
2 questions today?
3 Q I don't understand this type of law. I'm very
4 scared. I'm willing to come back and speak with an
5 attorney, but I can't afford an attorney at this time, so
6 you guys would have to appoint me an attorney.
7 A Just so you know, the appointment of counsel is
8 not something that we are able to do. This is a civil
9 proceeding and not a criminal proceeding and so there are
10 no funds available. We don't, typically, as a matter of
11 course, appoint counsel for anyone.
12 If you're interested in retaining your own
13 attorney you are, of course, free to do that. I do
14 understand that you've asked for a couple of extensions
15 of this date in order to retain an attorney; is that
16 correct?
17 A I think you gave me a total of two weeks of
18 extensions. I don't understand this type of law. Like I
19 said, I'm very scared. I'm willing to comply in any way
20 necessary, but I'd have to have an attorney present, and
21 at this time, I can't afford one.
22 Q There is a provision in the United States
23 Constitution called the Fifth Amendment and that provides
24 that a witness has the right to refuse to answer
25 questions when you believe that your answer to those

Page 7

1 questions may incriminate you in a criminal matter.
2 Are you asserting your rights under the Fifth
3 Amendment to refuse to answer substantive questions?
4 A I'm extremely frightened with this situation.
5 I don't understand this type of law. I've never dealt
6 with anything like this. I'm more than willing to
7 comply, but I'd have to have an attorney present. I
8 can't afford one at this time.
9 Q So, you're not interested at this time in
10 asserting your Fifth Amendment rights against
11 self-incrimination?
12 A I don't understand the Fifth Amendment rights.
13 I'm very frightened. I'm very scared. I don't know what
14 the SEC is, or what they do. I'm more than willing to
15 comply, but I'd have to have attorney present. I can't
16 afford one right now.
17 Q Why don't we take it on a question-by-question
18 basis? You've stated a couple of times that you're very
19 scared. What is it that your scared of?
20 A I'm very frightened. I don't understand this
21 type of law. I want to help in any way I can, but I'd
22 have to have an attorney present, and this time I can't
23 afford one.
24 Q Okay. So, what frightens you?
25 A I'm really nervous. As you can see, I'm

Page 8

1 shaking. I don't understand this type of law. I don't
2 even know what the SEC deals in. I really want to help
3 and put this behind us, but I'd have to have an attorney
4 present and I can't afford one at this time.
5 Q So, in other words, if I ask you questions
6 about your involvement with Josh Garza, and with GAW
7 Miners, I understand that you did work for GAW Miners for
8 a number of months; is that correct?
9 A I don't understand this type of law. I'm very
10 nervous answering any questions. I'm more than willing
11 to help out, but I'd have to have an attorney present and
12 I can't afford one at this time.
13 Q Let me just get this straight. You're refusing
14 to even answer questions concerning whether you worked
15 for the company; is that your position today?
16 A I'm very scared. I don't understand this type
17 of law. I'm willing to comply, but I'd have to have an
18 attorney present. As I said, I can't afford one at this
19 time.
20 Q Let me tell you what is necessary if you're
21 interested in complying. What is necessary is that you
22 provide us full, truthful, and accurate testimony unless
23 you assert your Fifth Amendment rights not to do so.
24 Attorneys are not appointed in this proceeding.
25 You've had since the date we issued the subpoena which

Page 9

1 was June 30th, in order to get an attorney and you
2 haven't done so; is that correct?
3    A   I'm very scared. I don't understand, these
4 type of questions, this type of law at all. I want to
5 help, but I'd have to have an attorney present. I can't
6 afford one at this time, but if I were to get appointed
7 counsel, or retain counsel, then I'd absolutely come back
8 and help.
9        BY MS. LUNDGREN:
10   Q   Mr. Garza, has somebody instructed you to
11 provide that answer to us today?
12   A   I'm extremely scared. These are my feelings.
13 I don't understand this type of law. This is my lack of
14 knowledge. I'm more than willing to help, but I'd have
15 to have an attorney present. And as I stated, I can't
16 afford one at this time.
17   Q   Why do you believe that you need to understand
18 Securities Laws in order to answer historical and
19 factually based questions that we have for you today?
20   A   My feelings are I'm just scared in this
21 situation. I don't understand this type of law. Because
22 of that reason -- I really want to help out and comply in
23 any way necessary, but I'd have to have an attorney
24 present, and I just can't afford one at his time.
25       BY MS. SHIELDS:

Page 10

1    Q   Do you have any reasonable likelihood of being
2 able to afford an attorney in the next three weeks?
3    A   At this time I can't afford an attorney. If I
4 was to be appointed one, I could absolutely come back
5 under his counsel, or her counsel, and answer any
6 questions they say I should. I cannot afford one at this
7 time.
8    Q   Okay. Well, let me tell you this. There are
9 no appointed counsel in our proceedings, so my question
10 to you is do you think that in the next three weeks, if
11 we were to give you another two or three weeks to come
12 back, that you could retain your own counsel?
13   A   I just don't understand this type of law and at
14 this current time, I can't afford an attorney. If I were
15 to be appointed one, I could absolutely come back because
16 I'm more than willing to help out. I'm just very
17 frightened of this situation. I've never dealt with
18 something like this in my life. I'm not familiar with
19 the SEC, but, I'm willing to help if I were to be
20 appointed counsel.
21   Q   Well, let me tell you a couple of things that
22 may ease your mind.
23       The SEC is a civil enforcement agency. We
24 don't take criminal actions. What we are able to do is
25 to take a variety of actions in the civil context. That

Page 11

1 means we can file lawsuits against people. We can seek
2 remedies like injunctions, money damages, bars from the
3 industry, and various other orders from the court that
4 would prohibit people from acting in a certain way in the
5 future.
6        We do share, on occasion, information with
7 criminal authorities, so information that you may provide
8 to us may be transmitted to criminal authorities, but,
9 we, ourselves, are not a criminal authority. That means
10 that we have no authority to ask that people be
11 incarcerated, or punished in a criminal fashion, for any
12 misconduct.
13       Let me tell you something else, the questions
14 we're going to be asking you today, if you choose to
15 answer them, relate to your employment at GAW Miners LLC
16 where I understand that you were employed for a number of
17 months. That is the subject matter on which we'd like to
18 question you today; do you understand that?
19   A   I'm extremely frightened. I don't understand
20 this type of law at all. You know, I want to help, I'm
21 eager to help, but I'd have to have an attorney, and as I
22 said, I can't afford one at this time. I'm very
23 frightened.
24   Q   Okay. You've got two choices here. You've got
25 the choice of hiring your own attorney, because one is

Page 12

1 not going to be appointed to you. Or, you have the
2 choice to invoke your Fifth Amendment rights against
3 self-incrimination. You don't have the choice to refuse
4 to answer our questions. That is what it means that we
5 have subpoena power. It means we can bring you here and
6 we're entitled to answers to our questions. Do you
7 understand that?
8    A   I don't understand this type of law. I'm very
9 frightened.
10   Q   Forget about this type of law; do you
11 understand what I just said to you?
12   A   I don't understand.
13   Q   I'm going to try again. You have two choices.
14 We can agree that in two weeks or three weeks you will go
15 out and find your own attorney and come back here with
16 that person, and with the counsel of that person, answer
17 our questions, or, you can assert your Fifth Amendment
18 right not to answer the questions I ask you today.
19   A   I don't understand. I'd have to retain counsel
20 and take his or her advice and then I'd be more than
21 willing to come back, and under that counsel, be able to
22 do as he or she advises.
23   Q   Do you intend to retain your own counsel? Do
24 you have funds that would make it feasible for you to
25 retain your own counsel?

Page 13

1    A    At this time I cannot afford an attorney, but
2 if you guys would appoint me one, then I would absolutely
3 come back and help out in any way that he or she
4 instructs me to.
5    Q    I'm telling you we don't have funds to have
6 counsel appointed for you.
7    A    I don't understand this type of law at all. It
8 just scares me.
9    Q    Are you going to have funds in the next two or
10 three weeks to retain your own counsel?
11    A    At this time I cannot afford counsel.
12    Q    Are you on any medication today that would
13 impair you from giving true and accurate testimony?
14    A    I don't understand this type of law. I'm eager
15 to help out in any way I can, but I'm very scared right
16 now. As you can hear, my voice is shaking. If you guys
17 were to appoint me counsel, then I would come back under
18 that counsel and I would answer any questions that he or
19 she advises. Right now, I'm very frightened.
20    Q    Other than being frightened, is there any
21 reason you couldn't provide true and accurate testimony
22 today?
23    A    I don't understand this type of law. I'm eager
24 to help in answering any questions if I had an attorney.
25 At this time, I can't afford an attorney, but if you guys

Page 14

1 would appoint me one I'd absolutely come back and do as
2 he or she instructs.
3    Q    Are you related to Homero Joshua Garza?
4    A    I don't understand this type of law. I'm very
5 scared. I'm eager to help in any way I can, but it would
6 have to be under advice of counsel. I can't afford
7 counsel at this time, so you guys would have to appoint
8 me counsel.
9    Q    Let me get this straight, you're refusing to
10 answer even the question of are you related to Homero
11 Joshua Garza?
12    A    I don't understand this type of law. It
13 frightens me very much so. I never dealt with anything
14 -- I don't know who the SEC is, what you guys deal in.
15 I'm eager to help though, but I'd have to have an
16 attorney present. At this time, I can't afford one so
17 you guys would have to appoint me one.
18    Q    You're refusing to tell us even whether someone
19 is your brother, and that doesn't require any
20 understanding of the federal securities laws; is that
21 right?
22    A    I'm very scared. I don't understand why I'm
23 here today. I don't understand the questions. I'm eager
24 to help, but I'd have to have an attorney present and I
25 can't afford one, but, if you guys appoint me one I will

Page 15

1 come back, absolutely.
2    Q    Did you work at GAW Miners LLC at any point in
3 time in 2014?
4    A    I'm extremely afraid, and I'm scared. I don't
5 understand this type of law at all. I've never dealt
6 with it, or anything like it. I'm eager to help out, but
7 you guys would have to appoint me an attorney because at
8 this time I can't afford one.
9    Q    Did you understand the question I just asked
10 you, whether you were employed at any point at GAW Miners
11 in 2014?
12    A    I'm extremely scared, kind of intimidated by
13 this situation to be honest. I would be eager to help
14 out if the counsel that you guys appointed to me told me
15 to answer questions, I would absolutely answer questions,
16 and help in any way that I could.
17    Q    Let me tell you what is going to happen next.
18 We are going to the court and ask the court for an order
19 that is going to compel you to answer these questions.
20 We have, as I've shown you, a Formal Order in this case
21 and that order entitles us to take testimony from members
22 of the public in connection with our investigations; do
23 you understand what I've just told you?
24    A    I don't understand this type of law.
25    Q    Let's forget about this type of law. Do you

Page 16

1 understand what I've just told you, that this formal
2 order that I've provided to you enables Gretchen and I to
3 ask questions of members of the public in connection with
4 our investigations?
5    A    At this point, I'm even more intimidated but
6 I'm eager to help. I would just have to have an attorney
7 present. I can't afford one at this time, but if you
8 guys appointed me one I would come back with the counsel.
9    Q    Appointing counsel in this context is not
10 something we can do. I think I've told you that a couple
11 of time. Do you understand that?
12    A    I'm not familiar with this type of law. I
13 don't understand, but I am eager to help.
14    Q    Do you understand what I'm saying to you when
15 I'm telling you that we don't appoint counsel for people?
16    A    I'm extremely frightened with this situation
17 because I'm ignorant to kind of all aspects of it, but I
18 do know that I want to help. If you guys appointed me
19 counsel, then I would absolutely come back under that
20 counsel and answer any questions.
21    Q    Did someone tell you to provide the responses
22 that you're providing today?
23    A    I'm extremely frightened. This situation
24 intimidates me. A government agency, which I believe you
25 guys are, intimidates me, but I'm eager to help, but I

Page 17

1 would just feel more comfortable and safe if I had
2 counsel, and, I can't afford counsel at this time.
3    Q   What efforts have you made to obtain your own
4 counsel?
5    A   I'm frightened.  I can't afford counsel at this
6 time, but if you guys apportioned me, then I would
7 absolutely come back with that appointed counsel, and I
8 would do as he or she instructs.
9    Q   The question I asked you is what efforts have
10 you made since June 30th when you received the subpoena,
11 or, July 1st when you received the subpoena, to obtain
12 counsel?
13    A   At this time I can't afford counsel, but if you
14 guys were to appoint it for me, then I would absolutely
15 come back.  I'm more than willing to comply in any way
16 necessary.
17    Q   Mr. Garza, in response to a number of my
18 questions you've provided basically the same answer that
19 you're scared, and frightened, and don't understand this
20 area of law and so you're not going to answer our
21 questions.  Is that the same response you'll give to any
22 question I ask you today?
23    A   I'm scared.  I'm frightened.  I want to help.
24 I can't afford counsel, but if you guys appoint me
25 counsel then I can absolutely come back under the advice

Page 18

1 of that counsel, and I'd be more than willing to do as he
2 or she instructs.
3    Q   What I'm going to ask you is a fairly simple
4 question.  It requires a yes, or, no answer and not that
5 recital.
6        If I ask you any question today, are you
7 basically going to say that same thing instead of
8 answering substantively?
9    A   I'm just scared to be honest.  I don't know
10 what to answer because I don't know this type of law at
11 all.  I'm scared because I want to help you guys, but I
12 would just have to have an attorney and I can't afford an
13 attorney.
14    Q   What we want you to tell us is the truth.  Is
15 that scary to you?
16    A   I don't understand this type of law at all.  I
17 don't understand what you guys deal in, but I do
18 understand that I want to help, but in order for me to
19 help I would feel way more safe and comfortable if I had
20 an attorney and as I said, I can't afford one right now.
21 But, if you guys appointed me one then I would absolutely
22 come back with that counsel and I would do as he or she
23 instructs.
24        MS. SHIELDS:  We'll go off the record for a few
25 minutes.  It is now 9:55 and we're off the record.

Page 19

1        (Off the Record from 9:55 a.m. to 9:57 am.)
2        MS. SHIELDS:  We're back on the record.  It is
3 9:57 a.m.
4        BY MS. SHIELDS:
5    Q   Mr. Garza, would you confirm for us that during
6 the brief break we took we didn't have any discussions of
7 substance about this case while off the record; is that
8 correct?
9    A   I'm sorry, I don't understand.
10    Q   Okay.  During the time between when we were off
11 the record, and came back on the record, neither Gretchen
12 nor I asked you any questions; is that fair?
13    A   I know this may sound silly to you guys,
14 because you're educated on this type of law, I just don't
15 know what type of questions to answer.  Like I said, I'm
16 just very ignorant on this and it frightens me.
17    Q   This is a very simple question.  Between the
18 time I told the court reporter we went off the record,
19 and when I told her we were coming back on the record,
20 did I ask you anything at all?
21    A   I feel kind of intimidated just because I don't
22 know what questions to answer and I just feel I would
23 feel safer if I had an attorney present to just -- that
24 knew this type of law and could instruct me on how to
25 answer.  I know that may sound silly to you, but I am

Page 20

1 scared of this situation.
2    Q   I'm going to make a statement for the record,
3 and then I'm going to ask you if you agree with me, or,
4 not, okay?
5        I'm representing for the record that between
6 the time we went off the record and when we came back on,
7 I didn't say anything to you.  Do you agree with that
8 statement?
9    A   Would you answer a question of mine?
10    Q   I can try.
11    A   Can I get in trouble for answering that
12 question?
13    Q   What do you mean my 'in trouble?'
14    A   I just don't understand this type of law.
15    Q   I'm asking you what happened in this room.
16 That can't possibly get you into trouble.
17    A   You're stating that it can't get me into
18 trouble?
19    Q   For saying what happened in this room between
20 us?
21    A   I know you're laughing, but it is just scary to
22 me.
23    Q   Why are you scared?
24    A   I don't understand this type of law.  I've
25 never been in this situation before.  I'm eager to help

Page 21

1 and I'm scared. I can't afford an attorney, but if I had
2 one I'd be more than willing to help in whatever way they
3 said I should.
4    Q    Did someone threaten you if you spoke with us?
5    A    I'm very intimidated right now. I don't
6 understand the type of questions that you guys are
7 asking, what you guys deal in. As I said, I'm wanting to
8 comply with you guys but I would have to have counsel but
9 at this time I can't afford it, so you would have to
10 appoint it for me.
11    Q    I understand that you don't understand the
12 federal securities laws but the questions that I'm going
13 to ask you today focus on things that you personally did,
14 or said, or heard, or, witnessed.
15    A    I don't understand this type of law.
16    Q    Okay. Put aside the law. What I'm going to be
17 asking you about today are the facts, things that you,
18 personally, were involved in. Do you understand that?
19    A    This situation scares me, it frightens me a
20 lot. I'm eager to help, as I stated, but I would have to
21 be appointed counsel by you guys because I can't afford
22 it as this time.
23    Q    Is your brother Josh Garza?
24    A    I'm very scared right now. I've never dealt
25 with anything like this. I'm eager to help but you guys

Page 22

1 would have to appoint me counsel because at this time I
2 cannot afford it.
3    Q    The residence where you currently life, 136
4 Hillcrest Terrace, is that a residence that your bother
5 owns?
6    A    I don't understand this type of law. For that
7 reason it frightens me. I want to help, and I feel
8 that's been, you know, something I want to do, but I just
9 can't afford an attorney, so you guys would have to
10 appoint me an attorney.
11              (SEC Exhibit No. 95 was marked
12               for identification.)
13       BY MS. SHIELDS:
14    Q    Mr. Garza, I'm placing before you Exhibit 95.
15 Is that a copy of a subpoena that you received in this
16 matter?
17    A    I don't understand exactly what type of law
18 this deals in. It just frightens me. I know it sounds
19 silly to you guys, but I would just feel more comfortable
20 if I had an attorney.
21    Q    I'm not asking you about the type of law, I'm
22 asking you is this a document you got in the mail.
23    A    Yes, ma'am.
24    Q    When did you get it?
25    A    I don't understand this type of law. It

Page 23

1 frightens me, just the questions that you're asking. As
2 I said I don't know what to answer and what not to
3 answer. For that reason, I'd feel a lot more safe and
4 comfortable if I had an attorney. I can't afford an
5 attorney at this time, so you guys would have to appoint
6 me one.
7    Q    When you say you don't know what kinds of
8 questions to answer, and what kinds of questions not to
9 answer, what do you mean by that?
10    A    I don't understand this type of law at all.
11 I've never dealt with anything like this. For that
12 reason, it frightens me and I would feel much better,
13 personally, if I had an attorney present to represent me.
14       As I stated I just can't afford one at this
15 time, but if you guys appointed me one I'd be more than
16 happy to come back and answer questions under his or her
17 guidance.
18    Q    Did someone tell you that they would impose
19 some kind of consequence on you if you came here and
20 answered our questions today?
21    A    I'm very frightened of this situation with the
22 SEC and you guys, because I don't understand this type of
23 law. This type of law intimidates me on a personal
24 level, so I would be more than happy, and I will answer
25 any questions, I'm willing to comply, I want to come

Page 24

1 back, but I'd have to have counsel, and you guys would
2 have to appoint it to me. But, as soon as you guys
3 appoint me counsel, I will come back and I will do
4 whatever he or she advises me to do.
5    Q    Who made threats against you if you were to
6 talk to us substantively today?
7    A    I am more than willing to comply with you guys.
8 This just scares me, and I would feel much more
9 comfortable if I had an attorney present that is educated
10 on this type of law and that could advise me on the
11 proceedings.
12    Q    The document that I placed before you, when was
13 the first time that you saw it?
14    A    As I said, this situation frightens me. I just
15 would feel more comfortable, and I want to help, and I'm
16 very willing to comply, but I'd have to have an attorney
17 present. At this time I can't afford one, so you guys
18 would have to appoint me one.
19    Q    I asked you when you first saw this document,
20 that doesn't require any understanding of the law, sir.
21    A    As I stated, I'm pretty intimidated, I'm pretty
22 scared, and I would just feel better if I had an attorney
23 present to advise me on this situation. I can't afford
24 one right now.
25    Q    Have you ever seen Exhibit 95 before today?

Page 25

1   A   This situation, in and of itself, really
2   intimidates me and frightens me. I've never dealt with
3   anything like this in my life. I'm not familiar with the
4   SEC, I'm not familiar with this type of law. I am eager
5   to help in any way that I can but I would have to have an
6   attorney present and you guys would have to appoint me
7   one because I can't afford one at this time.
8   Q   I'm going to turn to page 6 of the attachment
9   to Exhibit 95, and do you see it has up at the top,
10  'Heading C,' it says, 'Documents to be produced.' Do you
11  see that, sir?
12  A   I don't understand this type of law, and
13  answering your questions intimidates me. I will be more
14  than willing to comply in any way necessary but I would
15  have to have an attorney present and I can't afford one
16  at this time.
17  Q   What about answering a question, 'do you see
18  this heading, intimidates you?
19  A   I know it sounds silly but I don't know exactly
20  the power of the SEC, and I'm not educated on that. I
21  don't know what it deals in, and for that reason, it
22  intimidates me.
23      But, as I said, I'm more than willing to comply
24  and help out in any way possible to my abilities as long
25  as I have an attorney present. I can't afford an

Page 26

1   attorney right now, so you guys would have to appoint me
2   one.
3   Q   Are you on any drugs or medication today?
4   A   This situation intimidates me. Your questions
5   intimidate me. My lack of knowledge, you know, is scary
6   for this situation. I'm eager to help out but I'd have
7   to have an attorney to help advise me.
8   Q   Did you do anything to look for the documents
9   that are listed in category C on Exhibit No. 95, and the
10  list of documents requested is on pages 6, 7 and 8. Did
11  you do anything to look for those materials?
12  A   Yes, ma'am.
13  Q   Okay. What did you do to look for those
14  materials?
15  A   I didn't really have to look because this
16  situation intimidates me. I knew I didn't have any
17  documents. And I'm willing to comply and help, but I'd
18  have to have an attorney present.
19  Q   How was it that you knew that you didn't have
20  A   I feel intimidated, you know, and kind of
21  scared by your questions. As I said, I'd come back and
22  help answer any questions to my ability but I'd have to
23  have an attorney present. I can't afford one, so, if you
24  guys would appoint me one I would absolutely come back
25  and answer questions that he or she advises me.

Page 27

1   Q   Before today's testimony, did you send me an
2   e-mail basically representing that you didn't have these
3   documents because you no longer have access to the
4   computer that you used when you worked at GAW Miners?
5   A   I know it sounds silly to you guys, I can tell.
6   I don't mean to disrespect in any way, but this situation
7   frightens me. I'm not educated on this type of law. I'm
8   not educated about what you guys deal in. For that
9   reason, I feel, personally, that it is in my best
10  interest to retain counsel. I can't afford counsel at
11  this time, but if you guys were to appoint me counsel, I
12  would absolutely come back and answer any questions that
13  he or she tells me to. I don't mean to disrespect you
14  guys. I'm eager to help. I genuinely am. But, I'm
15  scared as you can see. I am frightened. I'll do
16  anything to help you guys, but just appoint me counsel
17  and I can come back under his or her guidance.
18  Q   Let me just try the question again.
19      Before testimony today, last week, or the week
20  before, did you send me an e-mail saying that you didn't
21  have any of the documents requested in Category C,
22  because you no longer had access to your GAW Miners'
23  computer?
24  A   Again I don't mean to disrespect you Ms.
25  Shields, I don't mean to frustrate you, but I just feel

Page 28

1   very uncomfortable answering your questions just because
2   I don't know what this situation entails. I don't
3   understand why I'm here exactly and I would prefer to
4   have counsel to guide me through it.
5       As I said, I'm very willing to comply. I will
6   come back and I will help in any way necessary, but you
7   guys would have to appoint me counsel because I can't
8   afford counsel at this time.
9   Q   So, you're refusing to answer about whether you
10  sent me an e-mail about two weeks ago in connection with
11  the subpoena?
12  A   Again, Ms. Shields, I don't mean to frustrate
13  you and I don't mean to upset you. I'm just scared. I'm
14  very frightened right now. I don't understand the
15  situation and that intimidates me. I hope that guys can
16  understand, but, as I stated, I am more than willing to
17  come back and help if you guys appointed me counsel.
18  Q   Being scared is not a reason not to answer our
19  questions, sir. You've got two choices. You can either
20  answer them, or you can assert your Fifth Amendment right
21  not to answer our questions for fear that your answers
22  might incriminate yourself. Those are your choices.
23  Telling me you're just scared isn't a valid response to
24  the questions that I'm asking you. Do you understand
25  that, sir?

Page 29

1    A    I absolutely don't understand this type of law.
2  I would feel much more comfortable if I had counsel to
3  advise me. This scares me. This situation scares me and
4    Q    What about this situation scares you?
5    A    I'm very ignorant on his type of law, on what
6  you guys deal in, it is very intimidating to me. I don't
7  know what you guys deal in. For that reason it frightens
8  me, but as I stated, I'm very eager to help. I want to
9  help. I'd love to put this behind me but I'd have to
10 have counsel, and you guys would have to appoint it to me
11 because I can't afford it at this time.
12    Q    And I've told you a couple of times, sir, do
13 you understand that appointing counsel is not an option
14 in this proceeding.
15    A    I apologize for my ignorance, but I just don't
16 understand this type of law at all.
17       BY MS. LUNDGREN:
18    Q    Mr. Garza, during the six week period you had
19 between receiving our subpoena and appearing here today,
20 did you make any attempt by going on the publicly
21 available SEC.gov website to learn what the SEC does, or
22 talk to anybody about this?
23    A    I don't understand this type of law and at this
24 time I just can't afford counsel, but if you guys were to
25 appoint me an attorney, then I would absolutely return

Page 30

1  under his or her guidance and then I would come back and
2  try to help out and with all of my ability.
3       BY MS. SHIELDS:
4    Q    Mr. Garza, are you presently working?
5    A    This situation kind of intimidates me. I would
6  feel more comfortable if I had an attorney present to
7  help with answering questions.
8    Q    So, you're refusing to tell us even whether
9  you're currently employed?
10    A    At this time, I can't afford counsel, but as I
11 stated I want to help. I'm eager to put this behind me
12 but this situation frightens me so you guys would have to
13 appoint me an attorney and then I would come with that
14 counsel and help as he or she instructs.
15    Q    Mr. Garza, what is your full name?
16    A    Again, Ms. Shields, I don't mean to be
17 disrespectful at all. I understand the importance of you
18 guys, but I don't understand this type of law at all.
19       Understand that I am scared and that I'm eager
20 to help, but I would have to have an attorney present. I
21 hope that doesn't silly to you guys, but if you guys
22 appointed me an attorney then I would come back and I
23 would absolutely help by any means that they told me to.
24    Q    How old are you, sir?
25    A    This situation intimidates me and I feel it is

Page 31

1  in my best interest to have an attorney present on my
2  behalf, and as I stated, I can't afford one but if you
3  guys would appoint me one, then I would be eager to help
4  answer any questions.
5    Q    What is your personal e-mail addresses, how
6  should we get in contact with you?
7    A    This type of law I'm just not familiar with.
8  Again, Ms. Shields, I don't mean to disrespect you ma'am.
9  I'm eager to help you both and answer any questions to
10 the best of my ability but I would have to have an
11 attorney present. I just feel that's in my best interest
12 with my lack of knowledge. I can't afford an attorney
13 come back with that appointed attorney.
14    Q    We've had several rounds of e-mail
15 communications; is that correct?
16    A    (No reply.)
17    Q    Particularly concerning the schedule for
18 today's date. Is that true? Were you the person I was
19 corresponding with by e-mail?
20    A    I know this sounds silly. This intimidates me,
21 as I stated.
22       On my address I think if we needed to converse,
23 of get a hold of me, that you could mail me something,
24 especially, if you guys are appointing me an attorney.
25 That way I could come back eagerly to help out in any way

Page 32

1  that I can.
2    Q    So, if we want to communicate with you we
3  should send mail to the 136 Hillcrest address in
4  Brattleboro, Vermont?
5    A    Can I get in trouble for answering that
6  question?
7    Q    I'm asking you how we can communicate with you.
8    A    I just don't understand this type of law, and
9  answering different questions. I know this sounds silly
10 because you guys are very educated on it, but I'm not. I
11 didn't learn about this in high school, but if you guys
12 were to appoint me an attorney that was educated on this
13 situation I could absolutely come back under his or her
14 guidance.
15    Q    During what period of time did you work at GAW
16 Miners LLC?
17    A    This situation intimidates me. I'm just
18 frightened. I know this sounds silly, but I would just
19 feel more comfortable if I had an attorney present that
20 was educated on this situation and in what you guys work
21 and deal in. I will come back and I will absolutely help
22 to the best of my ability and do as he or she says,
23 because they would be advising.
24    Q    Did you graduate from high school, sir?
25    A    Ma'am, I really don't mean to frustrate you,

Page 33

1 Ms. Shields, I want to work with both of you guys in any
2 way that I can. I'm just scared. This is a very scary
3 situation for me. I've never dealt with something like
4 this in my life before. In order to put this behind me,
5 I would feel that it is in my best interest to have an
6 attorney that better understands these situations and I
7 can't afford one right now, but, if you guys would
8 appoint me one then I would absolutely come back and help
9 in any way that I can.
10    BY MS. LUNDGREN:
11    Q   For the record I just want to state Mr. Garza,
12 you, in some of your responses say, 'I don't want to
13 frustrate you or upset you,' but for the record Ms.
14 Shield's voice has been very calm, very quiet, not
15 expressing really any emotion at all. So, I don't take
16 it from your response that there is anything that we've
17 done physically that is indicating any frustration on our
18 part. We've been very calm, courteous, and respective to
19 you not raising our voices to you.
20    A   (No response.)
21    BY MS. SHIELDS:
22 to witnesses who wish to invoke their Fifth Amendment
23 right not to testify. I'm going to ready this to you,
24 and then I'll ask you if you have any questions about it,
25 okay, sir?

Page 34

1    A   I don't understand this type of law at all.
2    Q   Hear me out. This is fairly standard, and it
3 is fairly simply so that anyone can understand these
4 words, okay?
5       I'm not authorized to compel you to give
6 evidence or testimony as to which you assert your
7 privilege against self-incrimination, and I don't intend
8 to do so. If you tell me that you want to respond to my
9 questions by asserting your fifth amendment right because
10 you're concerned that answering my questions might
11 subject you to criminal liability, I'll accept that.
12       I also don't have the authority to compel you
13 to answer my questions by giving you immunity from
14 prosecution. I can't do that.
15       Immunity decisions are made not by me, they're
16 made by somebody else.
17       So, any question that I ask you will be with
18 the understand that if you want to assert your Fifth
19 Amendment privilege all you need to do is say, 'I refuse
20 to answer on grounds that my answer might incriminate
21 me,' and that is the end of your response.
22       Do you understand that?
23    A   I don't understand this type of law at all.
24 Frankly, it really intimidates me because I don't
25 understand what you just spoke, and the Fifth Amendment

Page 35

1 rights.
2       For that reason, I would feel much more
3 comfortable if I had an attorney present on my behalf
4 that understands that, that could better instruct me. I
5 can't afford that attorney right now, so, if you guys
6 appointed me one I would come back and answer any
7 questions and try to put this behind us.
8    Q   Let's try this. You've said a couple of times
9 that you're frightened or you're scared. Is what your
10 frightened or scared of is being found criminally
11 responsible for some action? Is that what you're
12 concerned about, or is it something else?
13    A   I don't understand this type of law at all.
14 I'm very ignorant to it. That's intimidating to me. For
15 that reason I feel that it would be in my best interest
16 to have an attorney present who understands this type of
17 law and that has my best interest where they could
18 instruct me on how to answer.
19       And if you guys appointed me an attorney, I
20 would absolutely come back. I'm eager to help in any way
21 that I can, and I don't mean to -- I do not mean to be
22 disrespectful in any shape, or form, and, I think this
23 speaks to how serious I'm taking this situation.
24    Q   Sir, I know that you've said a number of times
25 that you don't mean to be disrespectful but the answers

Page 36

1 that you're giving are simply not an option in a
2 proceeding like this; do you understand that?
3    A   I don't understand this type of law.
4    Q   Okay. Let's leave aside 'this type of law.'
5 This is a proceeding in which the United States
6 ask questions of people about things that they did in
7 connection with GAW Miners. Are you with me so far.
8    A   I just don't understand this type of law and I
9 would prefer an attorney that is working on my behalf,
10 that better understands this type of law to help guide
11 me, and I think we would be able to come back and be able
12 to help answer questions, and, I would feel more safe. I
13 would feel better about my ignorance about this situation
14 because they would be able to better instruct me on how
15 to potentially answer, or what to answer.
16    Q   The first time we spoke by telephone you called
17 me and told me that you were calling me on a cell phone
18 that your brother Josh Garza had given you; is that
19 right?
20    A   I don't understand this type of law. It
21 intimidates me, just the questions, because I just don't
22 know that you guys deal in. I'm not trying to frustrate
23 you, but I think it is in my best interest to have an
24 attorney present that can instruct me, that can help me,
25 through this process so that we can put it behind us.

Page 37

1    Q    Sir, I'm asking you about a telephone call that
2  you made to me. Did you call me?
3    A    I know this sounds silly, Ms. Shields. I don't
4  mean to disrespect you, I just would feel more
5  comfortable, and that it is in my best interest, if I had
6  an attorney present that was working on my behalf.
7        If you guys were to appoint me one I would come
8  back and I would absolutely work with you guys under his
9  or her instruction and help out in any way that I can.
10    Q    What efforts have you made to try to find a
11  lawyer who will represent you?
12    A    At this time I am unable to afford an attorney
13  but as I stated if you guys appoint me one, I will
14  absolutely work with that attorney and come back to
15  answer any questions.
16    Q    Have you reached out to any bar associations,
17  or other groups to see if you could find an attorney to
18  help you in this matter?
19    A    At this time, I can't afford an attorney Ms.
20  Shields.
21    Q    But have you done anything to try to see if
22  there might be legal services available to you even
23  through you can't afford an attorney?
24    A    This situation just intimidates me, but if you
25  guys apportioned me an attorney, I would absolutely come

Page 38

1  back with that attorney and I would take his or her
2  advice on any questions that you guys have and work with
3  you guys, because, they would have a better knowledge of
4  his situation, what the SEC does and deals in, and we
5  could work towards whatever it may be that we're working
6  towards.
7        BY MS. LUNDGREN:
8    Q    Mr. Garza, are you refusing to answer questions
9  today because you're concerned that your brother, Josh
10  Garza, will somehow have access to a transcript of
11  today's proceeding?
12    A    I don't understand this type of law at all and
13  that's what frightens me is that I'm ignorant to what the
14  SEC deals in, and even why I'm here today. I have no
15  idea why I would be here, and that intimidates me and
16  that scares me. For that reason I feel it would be in my
17  best interest to have counsel appointed to me by your
18  guys, because I can't afford one, but as I stated I'm
19  willing to help and I will come back. But, I feel it is
20  fair to say that I would feel safer and better with
21  someone who understands what you guys deal in that could
22  advise me.
23    Q    We want to ask you about interactions you had
24  with Mr. Garza, your brother, and others that worked at
25  GAW Miners.

Page 39

1        We want to ask you about what went on at
2  various company events.
3        We want to ask you about representations that
4  GAW made on the websites or internet message boards that
5  the company sponsored. Those are the reasons that you're
6  here today, because we have a bunch of information
7  already, and we want to ask you about your role in those
8  things, and what you know about what happened in
9  connection with those events. Do you understand what
10  I've told you?
11    A    I don't understand this type of law at all.
12    Q    Okay. Forget about the type of law, do you
13  understand what I just said to you about the kinds of
14  things we want to ask you about?
15    A    Ms. Shields, I don't mean to frustrate you, and
16  I'm very sorry. I don't mean to be disrespectful; I
17  don't at all. This situation scares me. I'm frightened
18  of this situation.
19    Q    Okay. Tell me why --
20    A    I don't understand this type of law --
21    Q    Tell me why, why are you frightened?
22    A    I don't understand this type of law. I have
23  ignorance to this situation. For that reason, I feel it
24  would be in my best interest to have counsel who better
25  understands this and would be able to advise me. If you

Page 40

1  guys appointed me an attorney, I would absolutely come
2  back and under the advice of that counsel be able to help
3  out in any way that I can, as he or she instructed.
4    Q    How much did GAW Miners pay you in 2014?
5    A    I don't understand this type of law. This
6  frightens me. For that reason, I would prefer to retain
7  counsel and at this time, I can't afford one, but if you
8  guys appointed me an attorney then I would be willing to
9  come back and help in any way that they instruct me to.
10    Q    Did you work for any company or entity other
11  than GAW Miners in 2014?
12    A    I know this sounds silly that I'm scared and
13  frightened, but I just don't understand this type of law
14  and what you guys deal in. For that reason, I think it
15  is in my best interest to have an attorney present and I
16  can't afford one. But if you guys would appoint me one,
17  I would be absolutely be willing to come back and help
18  out in any way I can.
19    Q    Did you work for GAW Miners LLC in 2015?
20    A    This situation frightens me, and, again, I
21  would just feel it is in my best interest to have an
22  attorney present on my behalf to help guide me though and
23  use his or her knowledge of the law to help you guys out.
24  I'm more than willing to do that if you appoint me an
25  attorney.

Page 41

1   Q   Did you work for any entity, or company, or
2  person other than GAW Miners LLC in 2015?
3   A   I'm more than willing to comply and help answer
4  any questions but I would feel better if I had an
5  attorney present and I can't afford one right now.  But,
6  if you guys were to appoint me one, I would absolutely
7  come back and help in any way that I can.
8   Q   When did you stop working at GAW Miners LLC?
9   A   I am more than willing to comply but this
10 situation frightens me and if you guys would appointment
11 me an attorney I would be more willing to come back and I
12 feel that they would be better able to instruct me,
13 because I can't afford an attorney at this time.
14   Q   In an e-mail that you sent to me before today's
15 proceeding, did you tell me that you would bring with you
16 a copy of the 1099 tax form that you got from GAW?
17   A   I don't understand this type of law at all and
18 for that reason it frightens me.  I'm just scared and I
19 would just feel better about answering questions if I had
20 an attorney present.
21   Q   I'm not asking you a legal question, sir, I'm
22 asking about whether you said something to me in e-mail.
23   A   I know it may sound silly to you guys, I'm just
24 not educated on this type of law and so in order for me
25 to answer questions, I feel it in my best interest,

Page 42

1  personally, if I had an attorney present working on my
2  behalf.
3      I can't afford an attorney right now so if you
4  guys were to appoint me one, I'd be more than willing to
5  help you out as he or she instructs.
6   Q   During the time that you worked at GAW Miners,
7  did you ever have any concerns that the company was
8  engaged in fraud?
9   A   This situation scares me.  My ignorance too, it
10 scares me.  Why I'm here, and why I would be here with
11 you guys, frightens me.  I'm willing to comply and help
12 in any way that I can but I would just feel safer if I
13 had an attorney.  I'd feel better about things because my
14 ignorance and lack of knowledge to this situation,
15 frankly, frightens me.  But, if you guys appoint me an
16 attorney then I would absolutely be willing to come back
17 and help answer any questions.
18              (SEC Exhibit No. 96 was marked
19                 for identification.)
20      BY MS. SHIELDS:
21   Q   Mr. Garza, I'm placing before you Exhibit 96.
22 Is this an e-mail chain in which you participated?
23   A   I'm kind of scared right now because I don't
24 understand this type of law.  It intimidates me.  I feel
25 it would be in my best interest to retain counsel and at

Page 43

1  this time I can't afford an attorney, but, if you guys
2  were to appoint me one then I would come back and be
3  willing to answer under their guidance.
4   Q   In August of 2014, were you working at GAW
5  Miners?
6   A   I don't understand this type of law.  I want to
7  do what's right.  I'm eager to help you guys.  I just
8  feel it would be in my best interest if I had an attorney
9  working on my behalf.  At this time, I can't afford me
10 one, but if you guys were to appoint me one, then I would
11 absolutely come back and answer any questions that he or
12 she instructs me to.
13   Q   Why don't you take a moment to read Exhibit 96
14 and then I'll ask you some more particular questions
15 about it.
16   A   I'm a little frightened of this situation.  I'm
17 scared.  I don't feel comfortable because of my lack of
18 knowledge of what you guys deal in, and why I'm here
19 today.  For that reason, I feel it would be in my best
20 interest to have an attorney present who is better
21 educated on this type of law and has my best interest in
22 mind.  I can't afford an attorney right now, but if you
23 guys were to appoint me one, then I would absolutely come
24 back and I'm very eager to help answer any questions that
25 he or she instructs me to.

Page 44

1   Q   Okay.  Sir, what I asked you to do was read
2  Exhibit 96.  Are you capable of reading?
3   A   I don't mean to frustrate you Ms. Shields, I
4  don't.  I know this sounds silly but I just -- I'm
5  intimidated by this situation and for that reason I feel
6  it would be in my best interest to have counsel, and as I
7  stated, if you guys would appoint me counsel, I would
8  absolutely come back and help in any way that he or she
9  instructs me to.
10   Q   Are you impaired in any way, sir, that would
11 prevent you from reading a document?
12   A   I'm scared.  I'm very scared of this situation.
13 My lack of knowledge of this situation, and what you guys
14 deal in, frightens me.  For that reason, I would feel it
15 is in my best interest to have counsel working on my
16 behalf who understands the situation that would be able
17 to better guide me, and instruct me.  That way you both,
18 and I, the SEC, we could work toward resolving whatever
19 this is, you guys, the reason I'm here.
20   Q   For the record Exhibit 96 is a two-page
21 document.  It appears to be a series of e-mails that took
22 place, were sent, or received by you, sir, on August
23 18th, 2014.  They bear the Bates numbers, and, sir, those
24 are the numbers down in the right-hand corner,
25 SEC-MX-B-02979-E-245376-001 and 002.  Did I read those

Page 45

1 numbers correctly, sir?
2    A   I'm sorry.  I'm kind of scared in this
3 situation.  I would just feel better about answering
4 questions if I had guidance of legal counsel that you
5 guys could appoint to me.
6    Q   In the middle of the first page of Exhibit 96,
7 right about in the middle of the page, there is a line
8 that says on Monday, August 18th, 2014, at 10:01 p.m.
9 Carlos Garza, and then the e-mail address
10 carlos@geniusesatwork.com wrote: "Does that mean I'm
11 working on strictly commission?"
12       Do you see that on Exhibit committee 96?
13    A   I'm pretty frightened of this situation.  I
14 don't know why I'm here and what you guys deal in.  For
15 that reason I think it would be in my best interest if I
16 had an attorney.  I can't afford an attorney at this
17 time, but if you guys appointed me one then I would
18 absolutely come back and work with you under his or her
19 guidance to put this behind.
20    Q   And for the record, sir, when I was reading
21 that you weren't following along with me, were you?  You
22 were starring right straight ahead; is that correct?
23    A   I know this sounds so silly.  It sounds silly
24 to me as well.  I just would feel so much more
25 comfortable if I had an attorney present just because I'm

Page 46

1 scared.  I don't know what you guys deal in.  I'm very
2 frightened because of ignorance of this situation, but as
3 I said, I'm eager to comply and to follow along with
4 anything that you guys need from me as long as it is
5 under the guidance of counsel that would be able to
6 instruct me because they would be better equipped with
7 knowledge of this type of law and what exactly we're
8 dealing with.
9    Q   What I'm most interested in right now, sir, is
10 whether that's an email message you sent.  Can you answer
11 that question?
12    A   This situations frightens me.  I'm nervous
13 right now because I want to do the right thing.  I don't
14 want to disrespect you guys.  I don't want to frustrate
15 you guys.  I just feel it would be in my personal best
16 interest with my lack of knowledge of what you guys deal
17 in, in answering any questions if I had an attorney
18 present who was working on my behalf.  As I said, I'm
19 very eager to come back and help under the guidance of an
20 appointed attorney by you guys because at this time I
21 can't afford one.
22    Q   Mr. Garza is it fair to say that you're
23 refusing to even look at documents that we put in front
24 of you?
25    A   Can I get into trouble for answering that

Page 47

1 question?
2    Q   I'm asking you a question.
3       I put, look there is no mystery about this.  I
4 have this collection of documents.  This is a folder that
5 is about 4 inches thick, maybe even 5 inches thick, full
6 of copies of documents that I was planning to show to you
7 today; do you see that?
8    A   Can I get into trouble for answering this
9 question?
10    Q   I'm asking you whether you see this folder that
11 I'm showing you.
12    A   I don't mean to frustrate you, Ms. Shields.  I
13 don't understand this type of law and what questions --
14    Q   All right, sir.
15    A   -- how I should answer questions.  I want to
16 answer questions.  If I had an attorney that you guys had
17 appointed to me, I would come back and I would help as
18 long as I had their guidance.  I don't mean to frustrate
19 you, ma'am.
20    Q   Let me explain to you what is going to happen
21 next.  I'm going to ask you a series of questions that
22 are designed from my point of view to prove to the court
23 that us sitting here until 5:00 p.m. today is a waste of
24 my time, and a waste of Mr. Lundgren's time, and, a waste
25 of the court reporter's time.

Page 48

1       What I'm going to ask you is a series of
2 questions about whether you're going to give me this same
3 set of responses in response to anything I show you, or
4 anything I ask you today.  And if you tell me that the
5 answer is, yes, that you're going to continue to make
6 this same set of responses to any questions I ask you, or
7 any document relating to GAW Miners that I show you
8 today, then what I'm going to do is suspend this
9 testimony and go to court and ask a judge to order you to
10 answer my questions.
11       Do you understand that?
12    A   Can I get in trouble for answering that
13 question?
14    Q   I can't tell you what may or may not happen.
15 What I'm telling you is I'm going to take the transcript
16 that the court reporter is going to prepare as a result
17 of this, and I'm going to go to the court and I'm going
18 to say to the judge Mr. Garza came here today and refused
19 to answer any of my questions, and we terminated this
20 deposition after about an hour because spending six hours
21 more wasn't going to get me any further.
22       Sir, the choice is yours.  I'm interested in
23 your responses to these documents.  I truly am.  But if
24 you're going to sit here and refuse to read the material
25 I put in front of you, this is not only a waste of my

Page 49

1 time, but this is expensive.  That's not an expense that
2 I'm willing to incur, unless you tell me that there is
3 some benefit to doing that.
4        So, I'm going to ask you again, are you going
5 to refuse -- well, first of all, do you see this folder
6 of documents that I have on the table here?  It is about,
7 I'm pretty bad at inches, but I'd say about four inches
8 thick.  Do you see it?
9    A   This probably sounds silly but my thought
10 process is if, like I answer a question, I could
11 potentially get into trouble, or, something, even if it
12 is a yes, or, a no question.
13    Q   Why do you think that, sir?
14    A   I don't understand this type of law at all.
15    Q   Okay.
16    A   I don't understand what you guys deal in.  I
17 don't want waste your time.  I don't want to cost any
18 money.  As I said, I'm eager to help, I just would feel
19 more comfortable if I had an attorney and I can't afford
20 one.
21    Q   You've made it very clear that you want to have
22 an attorney, but I've also made it very clear to you that
23 attorneys -- we don't appoint attorneys in civil
24 investigative matters.  Have you heard me when I've said
25 that to you?

Page 50

1    A   I'm very sorry, Ms. Shields.
2    Q   Here is what I'm going to ask you.  It is up to
3 you whether you're going to answer them, or, not.
4        I have here a collection of documents relating
5 to GAW Miners LLC that I was planning to show you today.
6 I was planning to have you look at those documents, and
7 read them, and, answer questions about them.  If I put
8 any of these documents in front of you, are you going to
9 answer my questions substantively?
10    A   If I answer that, will I get into trouble for
11 answering that?
12    Q   What do you mean by 'in trouble?'
13    A   I just -- I'm scared because I know you guys
14 are a government agency.  That is where my knowledge
15 stops, and I'm intimidated that if I answer something, or
16 I do the wrong thing, that I could get in trouble and
17 that's just because -- like I said, I didn't learn about
18 this in high school.
19    Q   When you say, 'in trouble,' what do you mean by
20 that?  I can't answer a question sort of in the abstract,
21 'are you going to get in trouble.'  If you tell me that
22 there are particular things that you are concerned about,
23 I can tell you if those things are likely to happen, but
24 I don't know what you mean when you say, 'in trouble.'
25        Do you mean in trouble from your bother?  Do

Page 51

1 you mean in trouble from a court?  What are you talking
2 about?
3    A   I'm just extremely intimidated by this
4 situation, because I just don't know what you guys do,
5 what you guys deal in, and I just would feel way more
6 comfortable if I had an attorney to guide me though this
7 process so that I could be better equipped to help you
8 guys, and answer you correctly, and do the things that he
9 or she instructs me to do, because, that is their job is
10 to know what you guys know, and I just don't know that
11 stuff.
12    Q   We're going to try this one more time.  If I
13 show you any documents today relating to GAW Miners, are
14 you going to read them?
15    A   Can I get into trouble for not reading them, or
16 should I read them?  I would just prefer if an attorney
17 told me, an attorney working on my behalf, 'Carlos you
18 should read this and answer this,' because I don't know
19 the repercussions of anything with you guys, because, I
20 don't even know what you guys do.
21        I don't even understand the organization and
22 what you guys represent, so it intimidates me and it
23 scares me.  I just want to be as helpful as possible for
24 you guys, but to be better equipped with the knowledge
25 that my own attorney would bring.

Page 52

1        If you guys appoint me an attorney then I will
2 come back and I'll answer any questions that he or she
3 tells me, but I just don't know that to do in this
4 situation.  It just scares me.
5    Q   Are you going to answer my question about
6 whether you're going to read any document that I put in
7 front of you today?
8    A   (No reply.)
9    Q   Are you going to read any document that I put
10 in front of you today, yes, or, no?
11    A   Is it silly to think that I should have an
12 attorney to help me with this, just to say, 'Carlos, you
13 know, you have --.'  Then, they could tell me you have to
14 do this, and it is in your best interest to do that.
15 Then I think we would work towards, you know, everything
16 much quicker if they could just, they could, you know,
17 use their knowledge to kind of help guide me through this
18 whole process so that you guys would benefit more, as
19 would I.
20    Q   I can't tell you whether, or not, to get an
21 attorney.  What I can tell you is that we're not going to
22 provide one for you.  You can -- you're absolutely free.
23 It is 100 percent your right to go out and get yourself
24 an attorney.  The SEC doesn't pay for that.  It is your
25 choice, and it remains your choice.  You haven't given me

Page 53

1 any information to suggest that you've done anything at
2 all to try to get yourself an attorney.
3 　　Faced with that, I have a series of questions
4 for you that are going to determine whether we're going
5 to sit here until 5:00 o'clock today, or we're going to
6 end this relatively soon. So, will you listen to my
7 questions please?
8 　A　(No reply.)
9 　Q　The first of them is, are you going to read any
10 document that I put in front of you today?
11 　A　I don't have the funds to get an attorney. I
12 can't afford an attorney, but if you guys would appoint
13 me one I would absolutely come back. I just don't
14 understand this type of law and I don't understand that
15 you guys deal in.
16 　Q　I'm going to take your response as a no, you're
17 not going to read any document that I put in front of you
18 today; is that fair?
19 　A　I just don't want to get in trouble for things
20 that I don't know, that I'd know. I just -- I don't -- I
21 want to help you Ms. Shields. I'm eager to put this
22 situation, whatever the reason I'm here, behind me.
23 　Q　You can help, but not only is it helping, it is
24 your legal obligation to answer the questions that I ask
25 you today, unless you tell me that you're asserting your

Page 54

1 Fifth Amendment right not to do so for fear that
2 answering those questions is going to put yourself in
3 jeopardy of criminal prosecution, subject yourself to
4 criminal prosecution. That means prosecution by a
5 criminal law enforcement agency for a crime. If you want
6 to do that, that is certainly your right. But you can't
7 just sit here and tell me that you want me to appoint a
8 lawyer for you because that is not going to happen.
9 　A　I don't understand this type of law. I would
10 just feel better if an attorney that was working on my
11 behalf helped me through the process.
12 　Q　Is that refrain that you don't understand this,
13 and you're concerned, and you're worried, and you don't
14 understand what the securities laws are about, is that
15 the answer that you're going to give me to any question I
16 ask you today about your involvement with GAW Miners?
17 　A　(No reply.)
18 　Q　Is that what you're going to tell me in
19 response to anything I ask you today about GAW Miners?
20 　A　I'm sorry that I'm scared. I'm sorry because I
21 want to genuinely help. I just don't understand this
22 type of law and it really intimidates me.
23 　Q　I don't need you to be sorry. I just need you
24 to tell me what you're going to do if I keep asking you
25 questions about GAW Miners. What are you going to do?

Page 55

1 Are you going to answer those questions? Is there a
2 potential question about GAW Miners that I could ask you
3 that you might answer, or, is it a waste of my time to
4 keep sitting here with you, asking you questions about
5 GAW Miners?
6 　A　This situation just intimidates me. Like I'm
7 sorry I don't know what -- I feel personally, from my
8 lack of knowledge, it would be in my best interest to
9 have an attorney help me through this process, so that we
10 both benefit from that. And as I stated I can't afford
11 an attorney, but if you guys were to appoint me one then
12 I would come back with that attorney and they could guide
13 me through and I'll, you know, help you to whatever my
14 abilities are.
15 　Q　So, is it fair to say that in the absence of
16 some counsel advising you, you're not going to answer any
17 questions that I have for you about GAW Miners?
18 　A　Can you tell me if I'll get in trouble if I
19 just answer that?
20 　Q　Tell me what you mean by, 'in trouble?'
21 　A　(No reply.)
22 　Q　What I can tell you is going to happen next is
23 if you tell me that you're not going to answer my
24 questions, is I'm going to take the transcript that the
25 court reporter is going to prepare at the end of this.

Page 56

1 What she's doing is recording everything I say, and
2 everything that you say, and it is going to get all
3 written down on pieces of paper and I'm going to take
4 that to court and I'm going to ask a judge to make you
5 come back on another day and answer my questions.
6 　　And I may ask the judge to impose sanctions
7 upon you for refusing to answer my questions, and
8 sanctions can be any number of things. Without sort of
9 thinking it through, I don't know what I'm going to ask
10 the judge to do fully, but that is what I'm going to do.
11 　　So, this is your choice. You can let that
12 happen and take your chances with the judge, and make any
13 defense, or argument to the court that you would like, or
14 you can answer my questions.
15 　A　That frightens me so much because I don't
16 understand that type of law.
17 　Q　That is the choice that you have, sir.
18 　A　Will you guys appoint me an attorney?
19 　Q　Absolutely not.
20 　A　If you guys appoint me an attorney then I could
21 come back and I would answer under his or her guidance.
22 　Q　Look, I'm not going to get into an argument
23 about it with you, sir. We don't appointment counsel for
24 witnesses in civil investigations; it is not what we do.
25 　　This is the choice that you have to make, and

Page 57

1 it is you choice to make. And if you'd like you can have
2 a couple of minutes to think about it. I'm happy to give
3 you all the time you need to think about this choice. Do
4 you want a few minutes?
5    A   I'm just really scared of this situation. I'm
6 eager to do whatever it is that's right. I would just
7 feel much more comfortable if someone who better
8 understands this situation could explain to me who you
9 guys are, why I'm here, how to best assist you guys and
10 help you, and that they have my best interest in mind.
11 Then I could help, you know, in any way that he or she
12 instructs, and it would be beneficial for both of us.
13    Q   You choice, sir. Answer my questions or face a
14 subpoena enforcement action in court.
15    A   Ma'am, that scares me because I want to do the
16 right thing.
17    Q   I'm sorry it scares you but your obligation
18 when you get a lawful subpoena from the Securities and
19 Exchange Commission is to answer questions truthfully,
20 that's the choice you have.
21    A   I'm eager to help answer any questions. I just
22 can't afford an attorney right now. So, if you guys
23 appointed me one --
24    Q   We're getting nowhere. We do not appoint
25 counsel for witnesses in civil investigations. This is

Page 58

1 your choice. Do you want a few minutes to think about
2 it?
3    A   I'm more than willing to comply. I'm eager to
4 help out in any way that I can. I just can't afford an
5 attorney right now, so it you guys would appoint me one
6 then I could come back immediately with that attorney and
7 help answer any questions that he or she instructs.
8       Again, Ms. Shields, I don't mean to frustrate
9 you, and I don't mean to upset you. I don't want to
10 disrespect anything. I'm taking this very serious. I
11 just feel like it would be in my best interest if I had
12 an attorney here on my behalf to help guide me through
13 this process.
14    Q   Look, I'm not frustrated with you. I'm not
15 upset with you. You have not disrespected me. Let's
16 just leave that there.
17    A   Yes, ma'am.
18    Q   What I'm trying to do is figure out where we go
19 from here because as a matter of law I'm entitled to your
20 answers to these questions. What I'm trying to do is
21 figure out how I'm going to get those. I could get them
22 because a judge -- I could go to court and I could ask
23 the judge to order you to answer them and that is one way
24 I could get them. The other way is you could decide to
25 testify here today. Those are the choices that I see at

Page 59

1 the moment, and I'm giving you that choice, sir.
2    A   Could the judge appointment me an attorney?
3    Q   You could ask the judge for whatever you want.
4 I would oppose that request. I am telling you that you
5 can ask the court for whatever you want.
6    A   A judge would be able to appoint me an
7 attorney?
8    Q   I don't know where a judge would get funds to
9 do so, but judges have a lot of power. I can't give you
10 legal advice about what a judge could, or, could not do.
11    A   Yes, ma'am.
12       Well, I'll help out any way I can if maybe you
13 guys maybe can appoint me an attorney, or a judge can
14 appoint me an attorney, then I could come back and help
15 answer any questions under their guidance.
16    Q   So, I take it from that response that is what
17 you're choosing, is to suspend today's testimony and not
18 answer, essentially refuse to answer, any questions today
19 since you don't have an attorney; is that right?
20    A   I'm just scared. I'm sorry. I just want to do
21 the right thing. I would just feel more comfortable with
22 an attorney that understands the situation and then we
23 can help you guys anyway we can.
24    Q   So, not having an attorney with you today, or
25 having advised you, you're not going to answer my

Page 60

1 questions. Is that what you're telling me?
2    A   I can't afford an attorney at this time.
3    Q   Are you going to answer any questions that I
4 ask you today, substantively?
5    A   I'm sorry, Ms. Shields, I don't want to
6 frustrate you. I don't want to disrespect you. I just
7 want to do the right thing, and I would feel more
8 comfortable if I had an attorney to help me through this
9 process.
10    Q   Mr. Garza, I'm going to try one last time. I
11 can tell from your responses that you're perfectly
12 articulate. You seem to comprehend the English language.
13 You don't have any difficulty in speaking in English, or
14 speaking in English sentences, so I don't think that this
15 the issue here.
16       From your e-mail, I see that you're perfectly
17 capable of writing and responding to questions in written
18 English, including question about relatively complicated
19 technology.
20    A   Thank you.
21    Q   I don't have any concern that you don't
22 understand what's going on. I am concerned that you have
23 not attempted to read the Formal Order that we gave you
24 today, which explains this investigation, and, which, I
25 don't believe you've ever seen before today.

Page 61

1      That concerns me because a lot of what you're
2  saying is that you don't understand what this proceeding
3  is about and that Formal Order that we gave you at the
4  start of today's proceeding explains what this
5  investigation is about.
6      Based on my personal observation of you sitting
7  here today, you didn't -- other than look at the title of
8  it, you didn't read it at all. It's a three page, or
9  four-page document and you didn't turn the pages at all.
10     So, all of what you're saying about not
11 understanding this proceeding rings somewhat hollow to
12 me, because, based on what I've observed today, you've
13 made no attempt to understand what this proceeding is
14 about.
15    A   While we were off the record, before we
16 started, I flipped through every page, and when you asked
17 me did I have any questions I told you that I simply did
18 not understand and you asked if I had any specific
19 questions. I read through it, I just don't understand it
20 because I don't understand this type of law. That's why
21 I feel it would be in my best interest if I had an
22 attorney that could help guide me through these documents
23 and better explain why I'm here, what you guys do, and
24 how to assist you guys the best, and how to help you out
25 the best.

Page 62

1    Q   Okay. Well, let me tell you, it is very
2  simple. The way that you can assist is by answering our
3  questions, truthfully, and accurately, and, completely.
4  That is what we're looking for from you. That is your
5  obligation when served with a lawful subpoena, unless you
6  asset your Fifth Amendment right not to testify.
7    A   Are you saying that it is better for me not to
8  have an attorney?
9    Q   I am not telling you one way or another whether
10 you should have an attorney, or not. What I'm telling
11 you is your obligation is to provide us with truthful and
12 accurate testimony.
13     If you chose not to hire an attorney, whether
14 you can't afford one, or for some other reason, you're
15 still going to have to answer our questions.
16    A   I just feel like it would be in my best
17 interest to have an attorney, and, as I said, I can't
18 afford one, but if I was appointed one then I would come
19 back and under their guidance help in any way that I can.
20    Q   I understand that you want an attorney to be
21 appointed to you and I've told you on a number of
22 occasions that that is simply not something that the
23 securities and exchange commission does. So, faced with
24 your refusal, what I am taking as your refusal to answer
25 any questions without having first obtained legal advice,

Page 63

1  we're going to suspend today's testimony. I'm going to
2  ask that he court reporter prepare a transcript on an
3  expedited basis.
4    A   Yes, ma'am.
5    Q   And I'm going to go seek the involvement of the
6  court in this proceeding further. Do you understand
7  that?
8    A   I'm eager to help out in any way that I can.
9  If I were to be appointed an attorney, like you said,
10 maybe a judge could, then I could absolutely come back
11 and I will help to my fullest capacity under their
12 instruction. I'm just scared of this situation.
13    Q   I want to make it very clear to you that I have
14 made absolutely no representations about a judge
15 appointing counsel for you and, in fact, informed you
16 that we would oppose any such request; do you understand
17 that?
18    A   I misunderstood. I'm sorry.
19    Q   Do you understand now what I'm saying to you?
20    A   (No reply.)
21    Q   A court can always do what a court does, and
22 you can ask the court whatever you want. But, if you ask
23 the court to appoint you counsel in this proceeding, I
24 would likely oppose that request. Do you understand
25 that?

Page 64

1    A   Oppose the request meaning --
2    Q   I would ask the judge not to do that, do you
3  understand that?
4    A   Yes, ma'am.
5    Q   Okay. All right.
6      MS. SHIELDS:  Given all that, we're off the
7  record at 10:59 a.m.
8      (Whereupon, at 10:59 a.m., the examination was
9  concluded.)
10             * * * * *
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 65

```
 1              REPORTER'S CERTIFICATE
 2
 3  I, GAILANN KIMBROUGH, reporter, hereby certify that the
 4  foregoing transcript of 64 pages is a complete, true and
 5  accurate transcript of the testimony indicated, held on
 6  August 12, 2015, at Boston, MA in the matter of:
 7  GAW MINERS, LLC
 8
 9  I further certify that this proceeding was recorded by
10  me, and that the foregoing transcript has been prepared
11  under my direction.
12
13
14          Date:_____
15  Official Reporter:_____
16  Diversified Reporting Services, Inc.
17
18
19
20
21
22
23
24
25
```

Page 66

```
 1              PROOFREADER'S CERTIFICATE
 2
 3  In The Matter of:   GAW MINERS, LLC
 4  Witness:        Carlos Garza
 5  File Number:     B-02979-A
 6  Date:           August 12, 2015
 7  Location:        Boston, MA
 8
 9        This is to certify that I, Nicholas Wagner,
10  (the undersigned), do hereby swear and affirm that the
11  attached proceedings before the U.S. Securities and
12  Exchange Commission were held according to the record and
13  that this is the original, complete, true and accurate
14  transcript that has been compared to the reporting or
15  recording accomplished at the hearing.
16
17  _____     _____
18  (Proofreader's Name)      (Date)
19
20
21
22
23
24
25
```